Joseph Zelmanovitz (JZ 0085)
STAHL & ZELMANOVITZ
747 Third Avenue
New York, New York 10017
(212) 826-6422
jzelmanovitz@szlawllp.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

BKNS MANAGEMENT LLC, derivatively on
behalf of ABBSON LLC,

                          Plaintiff,

          - against -

MESSNER REEVES LLP, CLEARWATER
PREMIERE PERPETUAL MASTER LLC,
JONATHAN WRIGHT, TORBEN WELCH, and
TITAN FINANCIAL, LLC,

                          Defendants.

-----------------------------------------------------------------x

Case No. 24-cv-005581 (MKV)

**AMENDED COMPLAINT**

**JURY TRIAL
DEMANDED**

          Plaintiff BKNS Management LLC, for its amended derivative complaint on behalf of

Abbson LLC against defendants Messner Reeves LLP, Clearwater Premiere Perpetual Master

LLC, Jonathan Wright, Torben Welch, and Titan Financial, LLC, alleges as follows:

## INTRODUCTION

          1.      Plaintiff BKNS Management LLC, a member of Abbson LLC ("Abbson"), brings

this action on behalf of Abbson against defendants arising from their orchestration and

implementation of a massive fraudulent scheme against Abbson and others in violation of the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and

state and common law, by which defendants unlawfully appropriated and converted millions of

dollars from Abbson and other victims of defendants' fraudulent scheme.

2.      The fraud perpetrated by defendants involved their establishment of a shell company to act as a purported lender to companies like Abbson in dire need of funds to operate their businesses and who were fraudulently induced to enter into purported multi-million dollar loan arrangements. The victim's entitlement to loan proceeds was conditioned upon the victim remitting substantial funds to the so-called lender as an Interest Credit Account ("ICA") Payment, ostensibly for purposes of satisfying interest payments under the loan agreement with the lender. The lender was to commence remitting the loan proceeds to the victim within 90 days following receipt of the ICA Payment. In the case of Abbson, Abbson made this ICA Payment in the amount of $3.5 million conditioned upon receiving a $14 million loan from the supposed lender.

3.      Abbson, like the other victims of defendants' fraudulent scheme, while remitting the ICA Payment, never received any of the loan proceeds. The ICA Payment was disbursed to defendants and was never returned to the victim. A key player in this scheme is defendant Messner Reeves LLP, a national law firm. Messner first received the ICA Payments in the firm's escrow or trust account, and then funneled the ICA Payments to another account in a different state, where it would be distributed to defendants. There was never any intention of having the loan funded or the ICA Payment returned. In response to repeated demands for payment of the loan proceeds, defendants manufactured excuses for delaying the funding of the loans, thereby allowing defendants to dissipate the ICA Payment.

4.      After not receiving any loan proceeds for more than half a year (when the proceeds were to have commenced 90 days after the remittance of the ICA Payment), Abbson sent a termination notice to the lender in order to get back its ICA Payment, but it was never

2

returned–just as defendants intended.

5.      All of the foregoing steps in the fraudulent scheme–the entering into of a fraudulent loan or credit agreement, the receipt of millions of dollars in the form of so-called ICA Payments, the failure to fund the loan, the failure to return the ICA Payments, and the disappearance of the ICA Payment deposits from escrow that were initially held by defendant Messner Reeves in its trust or escrow account–were all part of the fraudulent scheme concocted by defendants for the purpose of stealing funds from unwitting victims like Abbson.  Each of these multi-victim episodes was identical in design and implementation.  None of the victims, like Abbson, received all of the loan proceeds or had their ICA Payments returned.  Defendants kept the funds as they had intended to do all along.

6.      The purported loan was a sham *ab initio*.  The loan proceeds were to have been forthcoming from the supposed lender, INBE Capital LLC ("INBE"), a Wyoming limited liability company that is nothing more than a shell-company set up by defendants to facilitate their fraudulent scheme.  INBE was formed in September 2022, only nine months  before the loan agreement with Abbson was made, and five to nine months before the other victims of defendants' fraud parted with their money, from April to August 2023.

7.      INBE's website contained many false statements regarding the deals it closed and the capital it possessed.  INBE's website contains false information and remains active to this day, continuing to lure unwitting companies in need of cash to sustain their operations but which in reality have no hope of ever seeing a dime from the loans even after depositing, like Abbson, substantial funds with INBE through Messner in the form of ICA Payments that the borrowers were fraudulently induced to make.  The loan agreement with Abbson and, upon information and

belief, those of the other victims of the fraud, contained commercially untenable terms which no legitimate lender would have entered into.  With respect to Abbson, the loan agreement provided in one part that the terms of the loan were to be governed by Wyoming law, and in another part that enforcement of the agreement was to be governed by the laws of "Western Australia."  It is readily apparent that INBE was a sham from inception, having no capital, no history, and no ability to fund anything let alone extending millions of dollars in a loan that was promised to Abbson and similarly to the other victims of this massive fraud.

8.      In orchestrating this massive fraudulent scheme, defendants truly merit the label of "racketeers" as contemplated by the RICO law.

## THE PARTIES

9.      Plaintiff BKNS Management LLC ("BKNS") is a New York limited liability company with offices located at 400 Rella Boulevard, Montebello, New York 10901.  BKNS is a member of Abbson LLC, owning 39% of its membership interests.  BKNS brings this action derivatively on behalf of Abbson LLC.

10.      Abbson LLC ("Abbson") is a New York limited liability company with its principal place of business located at 1325 Avenue of the Americas, 27th Floor, New York, New York 10019.  Abbson was engaged in the business of developing and creating podcasts.

11.      Defendant Messner Reeves LLP ("Messner") is a limited liability partnership engaged in the practice of law through its partners and attorneys practicing law in several states, including Colorado, Nevada, Arizona, Utah, California, and New York.

12.      Upon information and belief, defendant Clearwater Premiere Perpetual Master LLC ("Clearwater") is a shell limited liability company formed in May 2022 under the laws of

4

Wyoming.

13.    Defendant Jonathan Wright ("Wright") is an individual who, upon information and belief, resides in Wyoming.  During the relevant time period of this complaint, Wright was the Chief Funding Officer of INBE Capital LLC ("INBE") and the person who signed the Business Expansion Line of Credit Agreement (the "INBE Agreement") on behalf of INBE with Abbson.

14.    Defendant Torben Welch ("Welch") is an individual who, upon information and belief, resides in Utah and is an attorney and the managing partner of Messner's Utah office.  All actions taken by Welch as alleged below were undertaken under the auspices of Messner, using the name of Messner, and are attributable to Messner, which failed to supervise Welch and did not act to remedy the fraudulent activities of Welch when the nature of his transactions regarding INBE began to be revealed.

15.    Upon information and belief, defendant Titan Financial, LLC is a shell limited liability company formed under the laws of Wyoming in November 2023.

## JURISDICTION AND VENUE

16.    This court has original jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 1961, *et seq.*, and supplemental jurisdiction over all state and common law claims pursuant to 28 U.S.C. §1367, as those claims are so related to claims in this action within the original jurisdiction of the Court that they form part of the same case and controversy under Article III of the United States Constitution.

17.    Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions

giving rise to these claims occurred in the Southern District of New York. In addition, Messner is subject to jurisdiction in this District because it practices law in the State of New York through several of its partners. The other defendants are subject to jurisdiction in this District because they transacted business on an ongoing basis and committed the unlawful and tortious acts in this District described below causing harm to Abbson in this District.

**DERIVATIVE ALLEGATIONS**

18.     For many months prior to July 2024, BKNS, through its principal Brian Khunovich, demanded that the other members of Abbson, its directors and/or officers, namely Chad Abbott, Abbson's chief executive officer, and Igor Boldyrev, Abbson's chief financial officer, take action against INBE to recover from INBE and those responsible the funds in the form of the ICA Payment that Abbson had remitted to INBE based on the mistaken belief that by making that payment Abbson would receive a needed $14 million loan. After much urging, Abbot and Boldyrev finally sent a notice of termination to INBE and demanded the return of Abbson's ICA Payment–to no avail. But Abbott and Boldyrev did nothing else to enforce Abbson's rights in the matter.

19.     By email transmitted on July 8, 2024 to Abbott and Boldyrev, who are the individuals who managed the operations and affairs of Abbson, BKNS made a demand that they cause Abbson to commence a lawsuit against the defendants and related parties and assert claims under RICO and state law and common law. Messrs. Abbott and Boldyrev were also requested to advise BKNS if they intended to commence such an action and if so when it would be commenced.

20.     Messrs. Abbott and Boldyrev had their attorney respond that the attorney would

be filing such an action on behalf of Abbson, notwithstanding that the attorney had no authority under an agreement between plaintiff and Abbson and others to do so without the consent of BKNS. Nevertheless, no such lawsuit was filed. Therefore, BKNS commenced this action derivatively on behalf of Abbson.

21.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

22.    In May 2023, Abbson was seeking a substantial loan to fund Abbson's then current operations and the expansion of its business. Abbson was informed by its financial advisor, Jason Steinmetz of Merrill Lynch Pierce Fenner & Smith, that a purported lender, INBE, was in the business of making such loans. However, in order to obtain that financing, Abbson would be required to remit a substantial deposit, which was represented to be for the purposes of securing the payment to INBE of initial interest and other charges attendant to the loan. Abbson was further advised that this deposit would be maintained in an escrow account so that the advance payment by Abbson would be secure until the loan began to be funded.

23.    In June 2023, Abbson was further informed that it could obtain a loan in the amount of $14 million from INBE, provided that it remit the interest reserve deposit (the "ICA Payment") in the amount of $3.5 million.

24.    On or about June 19, 2023, Abbson, as Borrower, entered into a Business Expansion Line of Credit Agreement (the "INBE Agreement") with INBE, as Lender, with respect to a prospective $14 million loan to Abbson from INBE. On or about June 27, 2023, Abbson caused to be wired the sum of $3.5 million to Messner as escrow agent for INBE, which

7

Abbson believed and which the INBE Agreement indicated, would serve to secure the safety of the ICA payment for Abbson.

**The INBE Agreement**

25.     The INBE Agreement contained terms which with the benefit of hindsight reflected its sham nature and its use as a device to extract money from Abbson and other borrowers without any intention to create a true loan arrangement or for INBE to remit funds to Abbson and its other unwitting victims.

26.     For example, the terms of the INBE Agreement provide that INBE would not be liable for its failure to fund the loan if it results from the failure of INBE's wholesale lender to perform its obligation to INBE.   In addition, there was no requirement for a personal guarantee or collateral–which no responsible lender would ever agree to in light of the financial conditions of the borrowers.  The loan proceeds were to be made through a "LOC Disbursement Account" held jointly in the name of Borrower and Lender, but no such account was ever established by INBE.  The loan proceeds were to be used exclusively "for the purpose of financing the Project Costs," but no such Project Costs were ever specified.  Nor was the credit worthiness of Abbson ever looked into.  Funding of the loan was to commence "no later than ninety (90) calendar days . . . following confirmation of receipt by the Lender of the ICA Payment," but funding was not made by this 90 day deadline or anytime thereafter.

27.     Significantly, Section 10.12 of the INBE Agreement provides the express representation and warranty from INBE to Abbson that INBE "has the financial ability and wherewithal to fully fund the LOC in the full amount . . . ."  Further, INBE covenanted and agreed that "it shall fully and timely fund each Advance requested by Borrower so long as no

8

Event of Default has occurred . . . ." These representations and warranties were false when made: INBE was a mere shell company having no financial ability or wherewithal to fund the loan and it was never intended by defendants that INBE would provide any funding to Abbson.

28.    Upon information and belief, other borrowers and victims of INBE had similar provisions in their loan agreements with INBE.

29.    The INBE Agreement provides further that upon INBE's failure to fund the loan, Abbson could terminate the agreement and obtain a full refund of its ICA Payment. In March 2024, after repeatedly requesting updates as to the required funding by INBE but getting nothing in return, and at the continuous urging of BKNS, Abbson finally sent a Termination letter to INBE to end this charade of a multi-million dollar loan and get back its ICA Payment. But not one cent was ever repaid.

30.    Exhibit F to the INBE Agreement contained instructions to Abbson that it wire the ICA Payment in the amount of $3.5 million  to be held "by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit)." The instructions designated Messner as the recipient of these trust funds and the wire was directed to Messner's account at its bank in Chicago, Illinois. The instructions provide further that the ICA Payment was to remain in escrow until INBE funded the loan. The instructions provide further that "if there is a conflict between these Instructions and the Proposed Loan, these Instructions control."

31.    Upon information and belief, similar terms were contained in the loan agreements entered into between INBE and the other victims of defendants' fraudulent scheme.

32.    Defendants promised for many months that it would make good on loans committed to Abbson and other borrowers, but these were false promises designed to lull the

9

victims into refraining from acting earlier to enforce their rights. These false promises of funding gave defendants time to dissipate the funds taken from victims like Abbson.

**The RICO Enterprise**

33.     Defendants other than Wright are currently the subject of another federal RICO complaint alleging many of the same facts and claims as alleged in this lawsuit: *Kosher Eats LLC v. Messner Reeves LLP et al.*, Case No. 2:24-cv-05161 (U.S.D.C., Central Dist. of California) (the "Kosher Eats Lawsuit). Messner and Welch are also the subject of RICO claims in another federal case: *Kosher Eats LLC et al. v. Torben Welch, et al.,* Case No. 2:24-cv-00520-DBP (D. Utah).

34.     Defendants Messner, Clearwater, Wright, Welch and Titan, and INBE constitute an association-in-fact as a RICO Enterprise under 18 U.S.C. § 1962(c), the purpose of which was to defraud innocent corporate victims in need of cash for their operations. Through false representations, the victims entered into loan arrangements with INBE that required the victims to remit substantial sums to INBE (the "ICA Payment") just for the privilege of being able to receive funds from INBE in the form of purported loans that in fact never materialized.

35.     Upon information and belief, this illicit association began sometime in 2022 and the fraudulent scheme was realized in 2023 through the appropriation and conversion of Abbson and the other victims' funds in 2023.

36.     According to the complaint in the Kosher Eats LLC lawsuit mentioned above, the genesis of this illicit enterprise is a building project, All Net Resort & Arena ("All Net"), an arena in Las Vegas, promoted by a former college basketball player, Jackie Robinson ("Robinson"). Messner and Welch, as attorneys, represented All Net and Robinson in that

endeavor. Messner and Welch also represented Clearwater, which became an equity partner in the project. Clearwater represented that it maintained an office which in reality did not exist. All Net turned out to be an abysmal financial failure and was insolvent. In an attempt to salvage this failed project, Messner and Welch conspired with Daniel Chartraw, a convicted felon, who had pleaded guilty to felony wire fraud in connection with a fraudulent scheme to extract money from a victim by having the victim pay a smaller amount in consideration for the promise to receive a larger sum as a loan which never came to pass–similar to the fraudulent scheme perpetrated against Abbson. The team of Messner, Welch and Chartraw then perpetrated a fraudulent bond scheme to obtain financing for the failed All Net project. Clearwater's operations were run by Chartraw. In connection with this latest part of the All Net scheme, Welch stated that Clearwater had acquired rights to the Bond Certificate, which was purportedly to create project financing. But the bonds were backed by worthless assets. These phony financing mechanisms were employed by Messner, Welch, Clearwater and Chartraw to persuade the Las Vegas Zoning Commission to grant an extension of time to commence the All Net project construction. To obtain the needed financing for the All Net project, Messner and Welch disseminated misleading statements to brokers in furtherance of the scheme.

37.    Because the bond financing scheme did not succeed, Messner and Welch conspired to perpetrate yet another fraudulent scheme, through a newly formed shell company INBE, to generate the revenue needed to salvage the All Net project which by September 2022 had no viable means of raising financing.

38.    On or about September 26, 2022, INBE, a shell entity, was formed under Wyoming law with the same address as Clearwater. As with Clearwater, Messner and Welch

represented INBE. Upon information and belief, Messner and Welch were instrumental in the establishment of INBE.

39.    The purpose for the formation of INBE was to provide a mechanism that would generate illicitly-obtained funds for the defendants through their operation of an illegal RICO enterprise, comprised of an association in fact of Messner, Welch, Clearwater, Wright, Titan and INBE. Defendants provided the structure through which the enterprise would operate.

40.    The members of the enterprise had a unified purpose in mind in forming and operating the RICO enterprise: to appropriate funds from unwitting corporate victims that were experiencing severe financial difficulties and who believed they were remitting funds to cover advance interest charges in order to obtain loans in an amount four times that remitted to INBE, and for defendants then to pocket those funds.

41.    Each of the members of the RICO Enterprise had a definitive role in the enterprise. INBE, the shell company established for the purpose as acting as a legitimate lender, served as the purported lender in the fraudulent scheme. Upon information and belief, INBE was controlled by defendants Messner, Welch and Wright.

42.    Messner and Welch, as attorneys, provided the imprimatur of legality with respect to the fictitious loan transactions and their supposedly maintaining the ICA Payments sound and secure in an unreachable attorney escrow account. These defendants acted as attorneys for INBE as well as Clearwater. Upon information and belief, these defendants drafted the INBE Agreement and related documents. And by their acting as counsel for INBE and Clearwater, Messner and Welch sought to immunize their communications made in furtherance of the fraudulent scheme under the umbrella of the attorney-client privilege. Messner and Welch

12

sought to benefit monetarily from the illicit scheme, by sharing in the funds received from the victims and never returned, and thereby obtaining payment for the attorneys' fees they had charged but were not paid for in connection with the failed All Net matter.

43.    Clearwater's role in the enterprise was to serve as a partner with INBE. It formalized that relationship in a Joint Venture Partnership Agreement with INBE dated on or about April 23, 2023. Defendants used Clearwater as the excuse which they communicated to the victims for delaying the payment of the loan proceeds or not returning the ICA Payments. For example, an email on December 15, 2023 from INBE's counsel, Jason C. Aufdermaur, stated: "Clearwater funds will be disbursed imminently to several parties." This was false. Mr. Aufdermaur also stated that he was working with Messner and Clearwater "to determine an appropriate process and required documentation" for purposes of the distribution of funds to the borrowers (which never occurred). He expressed the false assurances of Clearwater as follows: "Clearwater's goal is to have funds available no later than Friday 12-22 (we have been told that this is an outside date)." All of these assurances of payment through Clearwater were false and designed to deceive the victims of the fraud into believing that they would have their money returned–a false hope. Upon information and belief, each of the defendants had knowledge of this email and its purpose, and approved its transmission.

44.    Wright's role in the enterprise was to execute the fake INBE loan agreements on behalf of INBE as its "Chief Funding Officer." In that role, Wright knew that the promises, representations and warranties made by INBE in the INBE Agreements were absolutely false, including the representations that INBE had the financial ability and wherewithal to provide the funding and to make timely disbursements. Upon information and belief, Wright too sought to

gain by his participation in the illegal RICO enterprise by sharing in the funds misappropriated from the victims.

45.     Titan is another Wyoming LLC set up by defendants. Titan's role came into play when it became necessary for defendants to cover-up their fraudulent scheme. Thus, after some of the victims of the fraud pursued Messner and Welch for the return of what they had been led to believe was their escrowed money, Welch sent an email to counsel for Emerald Consulting Partners on January 25, 2024, one of the victims of the fraud, stating that the funds remained part of the escrow under Messner's control at Titan. That was false. Titan is not a bank and could not administer IOLTA accounts. The account was fraudulent. Each of the defendants knew of the above false email and approved the transmission of it to Emerald Consulting Partners in an effort to cover up defendants' fraudulent activities and deflect the inquiries of defendants.

46.     Defendants were able to lure their victims to a substantial extent by posting false information on INBE's website, that imparted the fiction that INBE had billions of dollars in its "investment pipeline" by December 2022. This information was false and was intentionally posted by defendants to deceive and lure unwitting victims who were in dire need of financing for their businesses. On December 3, 2022, about two months after INBE was formed, INBE's website stated falsely that INBE had over $13 billion in a "rapidly growing global investment pipeline" and the "capacity up to $50B per transaction." These statements were false; INBE had little or no capitalization whatsoever. Upon information and belief, defendants, including Messner and Welch, knew of and approved the false statements made on INBE's website, and joined in the illicit effort to lure unwitting borrowers to part with their money.

**Predicate Acts and Other Victims of Defendants' Fraud**

47.    While Abbson appears to be the victim of defendants' fraudulent scheme with the largest dollar amount lost by reason of the ICA Payment that was made and never returned, Abbson is aware of at least the following additional victims of defendants' fraud: (1) Kosher Eats LLC; (2) Emerald Consulting Partners; (3) MSC Companies, LLC; and (4) Konala, LLC.

48.    Defendants committed acts constituting the offense of wire fraud, 18 U.S.C. § 1343, in that they devised a scheme to defraud Abbson and others and to obtain their money by means of false or fraudulent pretenses; i.e., the fictitious loan arrangement.  Defendants used the wires to further the scheme in violation of 18 U.S.C. § 1343.

49.    Thus, through fraudulent means, defendants caused to be transmitted to Messner's attorney escrow or trust accounts by means of wire communications the following amounts on the following dates from innocent victims of the fraud, ostensibly as ICA Payments that were never returned:

　　　　　(1)    $3,500,000 from Abbson on June 29, 2023

　　　　　(2)    $2,000,000 from Kosher Eats LLC on April 27, 2023

　　　　　(3)    $700,000 from Emerald Consulting Partners, LLC on June 13, 2023

　　　　　(4)    $1,145,000 from MSC Companies, LLC on June 19, 2023

　　　　　(5)    $325,000 from Konala, LLC on August 1, 2023

50.    These wire deposits also were caused to be made by defendants in violation of 18 U.S.C. §§ 2314 and 2315 (transportation and receipt of stolen money), in that defendants caused to be transported, and induced these victims to transport, money in interstate commerce, in the execution of defendants' scheme to defraud the victims and convert their money knowing that it

would not be returned to them.

51.    Abbson caused $3.5 million to be wired into the Messner escrow or trust account in reasonable reliance upon the false representations made in the INBE Agreement, including the false representation and warranty that funding of the loan was to commence "no later than ninety (90) calendar days . . . following confirmation of receipt" by INBE of the ICA Payment;" that INBE "has the financial ability and wherewithal to fully fund the LOC in the full amount . . . ;" that INBE would "fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred . . . ;" and that if INBE did not fund the loan, Abbson could terminate the agreement and obtain a full refund of its ICA Payment.  Further, the INBE Agreement stated falsely that Abbson's $3.5 million ICA Payment would be "held by a nominated Trustee (attorney)," which was Messner.  None of those funds was held safe and secure in a Messner escrow account.  Each one of these promises, representations and warranties was false when made and defendants, including Messner and Welch, knew they were false but used them to fraudulently induce Abbson to part with its $3.5 million in furtherance of defendants' scheme.

52.    Upon information and belief, the INBE Agreement–a device used by defendants to lure Abbson and other victims to transmit their ICA payments which would never be returned to them–and the false statements contained in the INBE Agreement, were transmitted by INBE to Abbson in or about June 19, 2023, by means of the interstate wires or mail.  Upon information and belief, each of the other victims received its fraudulent INBE loan agreement from INBE through the interstate mails or wires.

53.    Upon information and belief, Abbson and the other victims of the fraudulent

scheme were directed by INBE to return executed agreements or signature pages by the interstate mails or wires, which they did.

54.     Upon information and belief, the other victims of defendants' fraudulent scheme similarly were induced to wire their ICA Payments based on similar false representations and warranties contained in the fictitious loan agreements with INBE prepared by Messner and Welch.

55.     Messner and Welch were not acting simply as legal counsel rendering advice and services to a client, i.e., INBE.  Upon information and belief, Messner and Welch participated in the establishment of INBE as a tool through which to obtain funds from unwitting borrowers in need of financing and who had no means to obtain such from traditional, regulated lenders. Upon information and belief, instead of holding the borrowers' ICA Payments, including Abbson's $3.5 million ICA payment, in Messner's trust or escrow account in Chicago, Illinois (in the case of Abbson) or in Colorado, Messner and Welch caused the funds to then be transferred to an account in Wyoming.   Upon information and belief, defendants, including Messner and Welch, participated in the drafting of the INBE agreements knowing full well that it contained false statements intended to lure the borrowers, including INBE, to part with their ICA Payments.

56.     Abbson's $3.5 million and, upon information and belief, the ICA Payments of the other victims listed above, were never returned to them despite the demand that INBE do so.

57.     Each of the above acts of defendants affected interstate commerce and constitutes a predicate act of racketeering ("wire fraud") under 18 U.S.C. § 1962(c).  Defendants ' use of the wires was an essential part of the fraudulent scheme, and was the method by which the victims,

like Abbson, would be immediately deprived of their money. It was defendants' intent to use such wires to implement their fraudulent scheme.

58.    The above acts of wire fraud were not isolated, were related as part of defendants' scheme to defraud, and are part of a pattern of racketeering activity with the illicit goal of defrauding companies in dire need of financing to part with their money based on their mistaken belief that the needed loans would be obtained.

59.    The conduct of defendants is ongoing and poses a continuing threat to the public, and especially to other companies facing financial difficulties like Abbson.

**DEFENDANTS' DECEPTIVE COVER-UP FOR THEIR FRAUD**

60.    Having failed to fund Abbson's loan or even to return to Abbson its $3.5 million ICA Payment, defendants then engaged in a months' long circuitous series of excuses designed to stall Abbson from enforcing its rights to recover its funds, pretending that the loan would be forthcoming. It never was. It was the intent of defendants to effectively play hide and seek by passing the buck to other members of the fraudulent conspiracy, with each then disavowing responsibility and leaving Abbson without recompense. None of the defendants committed to returning Abbson's funds or to assume responsibility for the return of the funds.

**FIRST CLAIM FOR RELIEF**
**Violation of RICO, 18 U.S.C. § 1962 (c)**

61.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-60 above, as if fully set forth herein.

62.    Each of the defendants violated 18 U.S.C. § 1962 (c) by engaging in the conduct of an enterprise, an association-in-fact comprised of Messner, Welch, Clearwater, Wright, Titan

18

and INBE, through a pattern of racketeering activity.

63.     Each of the defendants is a "person" as defined in 18 U.S.C. § 1961(3).

64.     The defendants and INBE constituted an ongoing association in fact, i.e., the "enterprise, which is an enterprise as defined in 18 U.S.C. § 1961(4), with a decision-making framework or mechanism for controlling the association.  The members of the enterprise had and have a common purpose and function as a continuing unit.  The enterprise is separate and apart from the pattern of racketeering activity complained of herein.

65.     Each member of the RICO Enterprise has participated directly or indirectly in the conduct, operation or management of the affairs of the enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1), that was directed at the business and property of Abbson and the other victims of defendants' fraudulent scheme since about May 2022 through the date hereof.  The illicit actions of defendants described above are ongoing and continuing.

66.     In fact, defendants' fraudulent scheme continues to today.  INBE's website, https://theinbegroup.com/, on December 3, 2022, contains many false statements designed to continue to lure new borrowers into entering into fictitious loan arrangements with INBE, including the false statements that "your original principal investment is always safe. . . .  Your funds are secured and insured within an audited and SEC registered vehicle.  We take on the risk by using our own collateralized assets for deal structuring and deployment."  The same false statements appeared as late as November 6, 2024 on INBE's website.

67.     Upon information and belief, Messner and Welch, the architects of the INBE fraudulent setup, knew of and approved of these false statements, knowing full well that they

were false and that unwitting borrowers–new victims–would thus be lured to part with their

funds in the anticipation of obtaining loans in amounts that were many times the amount of their

ICA Payments.

68.    The foregoing predicate acts of mail and wire fraud, and interstate transportation

of stolen money, in violation of 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. §§ 2314 and 2315,

were largely dependent on their relatedness and continuity, and embraced criminal acts that have

the same or similar purposes, results, participants, victims, and methods of commission.  The

predicate acts are interrelated by their distinguishing characteristics that render such acts not to

be isolated or sporadic events, but rather conduct that was ongoing and continuing since May

2022 in furtherance of defendants' goal of extracting millions of dollars from companies in dire

financial straits under false and fraudulent pretenses, and amount to or pose a continuing threat of

indefinite duration, that is, of similar criminal activity in the future, as a regular and standard way

of conducting the business of the enterprise.

69.    All of the defendants, as members of the RICO Enterprise, were willing

participants in the various schemes and artifices to defraud Abbson and the other victims

identified above, in different capacities, functions and roles calculated to enrich the enterprise

and in the desire to continue to perpetuate such schemes and artifices for as long as possible and

to commit similar fraudulent schemes against other companies in dire need of funds for the

continued operation of their businesses.

70.    Upon information and belief, the governance of the RICO Enterprise was effected

though frequent communications among its members and the victims of the fraud by means of

interstate mail and wire communications, thereby affecting interstate commerce within the

meaning of 18 U.S.C. § 1962 (c). The extent of such wire communications made in violation of

RICO should be revealed after further investigation and discovery in this action.

71.    The multiple acts of mail and wire fraud and interstate transportation of money

committed in furtherance of the fraudulent scheme form a pattern of racketeering activity in

violation of RICO, comprise repeated criminal conduct, and are related to one another as part of a

common criminal plan to perpetrate the scheme to defraud Abbson and the other victims

identified above and as yet other unidentified victims, and to enrich the RICO Enterprise. The

predicate acts have the same purpose, result, participants and methods of commission, and are

not isolated events.

72.    The predicate acts of racketeering are also related to each other as a result of each

defendant's position in the RICO enterprise or its involvement in or control over the enterprise's

affairs, and all relate to the activities of the RICO enterprise. Each of the defendants coordinated

with each other the various steps in the fraudulent scheme that were necessary in order to succeed

in the implementation of the fraudulent scheme.

73.    This repeated conduct of racketeering activity is ongoing and continuous, and

amounts to or poses a continuing threat of indefinite duration that is of similar criminal activity

in the future, as a regular and standard way of conducting the RICO enterprise's business. The

RICO enterprise poses the threat of continuing to plunder and retain substantial funds belonging

to victims of the fraudulent scheme.

74.    Each defendant's violation of RICO was both a "but-for" and "proximate cause"

of Abbson's injury. Abbson relied on the representations, promises and warranties made by

defendants in the INBE Agreement, whose representations, promises and warranties were false,

and defendants knew they were false when made.

75.    Such reliance by Abbson was reasonable and justified under the circumstances.

76.    As a direct and proximate result of defendants' violation of 18 U.S.C. § 1962 (c), Abbson has been injured in its business and property and has suffered damages in a sum not yet determined but not less than $3.5 million.

77.    As a result, Abbson is entitled to recover from defendants, jointly and severally, compensatory damages plus prejudgment interest, treble damages, the cost of bringing suit, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### RICO Conspiracy, 18 U.S.C. § 1962(d)

78.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-77 above, as if fully set forth herein.

79.    Defendants entered into a series of agreements between and among each other to engage in a conspiracy to violate 18 U.S.C. § 1962 (c).  Each defendant entered into at least one agreement with at least one other defendant to join the conspiracy, took acts in furtherance of the conspiracy, and knowingly participated in the conspiracy.

80.    Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c) by participating, directly or indirectly, in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

81.    By engaging in the overt acts and other conduct alleged herein, defendants have agreed to conspire and did conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal

predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), and otherwise agreed to violate 18 U.S.C. § 1962 (c).

82.    Each of the defendants is a member of the RICO enterprise and each conspired to perpetrate the illegal scheme.

83.    As co-conspirators, defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy, and are liable for all of the damages sustained by Abbson that were caused by any members of the conspiracy, regardless of whether defendants were themselves directly involved in a particular aspect of the RICO enterprise.

84.    As a direct and proximate result of defendants' misconduct as alleged above, Abbson has been injured in its business and property and has suffered damages in a sum not yet determined but not less than $3.5 million.

85.    As a result, Abbson is entitled to recover from defendants, jointly and severally, compensatory damages plus prejudgment interest, treble damages, the cost of bringing suit, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### Conversion and Aiding and Abetting Conversion against Messner and Welch

86.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-77 above, as if fully set forth herein.

87.    Messner assumed possession of the $3.5 million transmitted by Abbson for the ICA Payment in connection with the purported loan from INBE.

88.    Abbson sent notice of the termination of the INBE Agreement and made a demand for the return of its $3.5 million deposit that was supposed to have been held in escrow

or in trust by Messner.

89.    Messner has refused to return the $3.5 million to Abbson and prevented Abbson from receiving the return of its $3.5 million deposit.

90.    The ICA deposit payment was property of Abbson.

91.    Messner refused to cause the return to Abbson of its $3.5 million, in furtherance of the fraudulent scheme perpetrated by defendants against Abbson, as described above.

92.    As alleged above, Messner knew that the INBE loan would never be funded and assumed possession of Abbson's $3.5 million with the intent of dissipating those funds and preventing its return to Abbson.

93.    Messner exercised dominion and control over the $3.5 million and converted the funds for the illicit purposes of defendants.

94.    Welch, as a managing partner of Messner and participant in the fraudulent scheme perpetrated against Abbson, participated actively in the unlawful conversion of Abbson's funds and caused Messner to convert Abbson's funds, and aided and abetted Messner in the conversion of Abbson's funds.

95.    As a direct and proximate result of the conversion of the funds, plaintiff has suffered damages in the amount of $3.5 million for all of which Messner and Welch are jointly and severally liable.

96.    By reason of the foregoing, in addition to compensatory damages, Messner and Welch should each be liable to pay punitive damages in the sum of at least $5,000,000, so as to deter them and others similarly inclined from perpetrating in the future such acts of misconduct as were committed by them against plaintiff.

## FOURTH CLAIM FOR RELIEF
### Fraud and Aiding and Abetting Fraud

97.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-96 above, as if fully set forth herein.

98.     Messner made false representations and promises in connection with the INBE Agreement that Messner would be holding Abbson's $3.5 million deposit as an ICA Payment in escrow or in trust for Abbson.

99.     When Messner made the representations and promises that were included in the INBE Agreement, Messner knew they were false, knew they would be communicated to Abbson, and knew that Abbson was relying on the representations and promises. Messner made the representations and promises with the intent to defraud Abbson and lure Abbson to make the ICA Payment as part of the fraudulent scheme described above.

100.    Abbson relied on Messner's representations and promises that were communicated to Abbson through the INBE Agreement. The representations and promises were material to Abbson's decision to make the ICA Payment and enter into the INBE Agreement, and Abbson would not have made the $3.5 million deposit but for such false representations and promises.

101.    Abbson's reliance was reasonable and justifiable under the circumstances.

102.    When Abbson made the $3.5 million ICA Payment, it had no knowledge that Messner and the other defendants were engaged in a fraudulent scheme to induce Abbson to part with its funds, as described above.

103.    The other defendants aided and abetted Messner in the fraud with knowledge of

25

the fraud and by their active participation in the fraud.

104.    As a direct and proximate result of the fraud perpetrated by defendants against Abbson, plaintiff has suffered damages in the amount of $3.5 million for all of which defendants are jointly and severally liable.

105.    By reason of the foregoing, in addition to compensatory damages, defendants should each be liable to pay punitive damages in the sum of at least $5,000,000, so as to deter them and others similarly inclined from perpetrating in the future such acts of misconduct as were committed by them against plaintiff.

**FIFTH CLAIM FOR RELIEF**
**<u>Negligence against Messner</u>**

106.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

107.    As holder of the escrow money sent by Abbson in the form of the ICA Payment, and in performing its duties as the escrow agent, Messner was obligated to use the ordinary skill, and care in carrying out its duties that are commensurate with the standard of care that escrow agents, and especially attorneys at law, are required to exercise in similar circumstances.

108.    As the holder of the trust or escrow funds of $3.5 million sent by Abbson as an ICA Payment, Messner was obligated to hold Abbson's $3.5 million in Messner's "sole possession and control" and to exercise such skill and care in preserving the trust or escrow funds, maintaining the safety and security of the funds, and ensuring that the purposes for which the escrow or trust was established are carried out.

109.    In serving as escrow agent regarding the $3.5 million ICA Payment remitted by

Abbson, Messner negligently breached its duty of care and the related duties it had as escrow agent.

110.    In negligent breach of its duties owed to Abbson, Messner transferred the $3.5 million out of its sole possession and control.

111.    The loss of Abbson's $3.5 million ICA deposit was a proximate and foreseeable result of Messner's breach of its duties as escrow agent.

112.    But for Messner serving as escrow agent for the ICA Payment, Abbson would not have remitted the ICA Payment.

113.    As a proximate and foreseeable result of Messner's negligence, Abbson sustained damages in the amount of at least $3.5 million.

WHEREFORE, plaintiff requests judgment as follows:

A.    On the First Claim for Relief, awarding plaintiff compensatory damages against defendants, jointly and severally, in the amount of $3,500,000, trebled to $10,500,000, plus plaintiff's reasonable attorneys' fees and prejudgment interest;

B.    On the Second Claim for Relief, awarding plaintiff compensatory damages against defendants, jointly and severally, in the amount of $3,500,000, trebled to $10,500,000, plus plaintiff's reasonable attorneys' fees and prejudgment interest;

C.    On the Third Claim for Relief, awarding plaintiff compensatory damages against defendants Messner and Welch, jointly and severally, in the amount of $3,500,000, plus prejudgment interest and punitive damages against each of Messner and Welch in the amount of at least $5,000,000, the precise amount to be determined at trial;

D.    On the Fourth Claim for Relief, awarding plaintiff compensatory damages against defendants, jointly and severally, in the amount of at least $3,500,000, the precise amount to be determined at trial, plus punitive damages against each defendant in the amount of at least $5,000,000, the precise amount to be determined at trial;

E.    On the Fifth Claim for Relief, awarding plaintiff compensatory damages against Messner in the amount of at least $3,500,000, the precise amount to be determined at trial;

F.    Awarding plaintiff its costs and disbursements of this action; and

G.    Granting plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 7, 2024

          STAHL & ZELMANOVITZ
          *Attorneys for Plaintiff*

By:_____
          Joseph Zelmanovitz (JZ 0085)
          747 Third Avenue, Suite 33B
          New York, New York 10017
          (212) 826-6422
          Jzelmanovitz@szlawllp.com

## JURY DEMAND

Plaintiff demands a trial by jury on all claims.

Dated: New York, New York
      November 7, 2024

          STAHL & ZELMANOVITZ
          *Attorneys for Plaintiff*

By:_____
          Joseph Zelmanovitz (JZ 0085)
          747 Third Avenue, Suite 33B
          New York, New York 10017
          (212) 826-6422
          Jzelmanovitz@szlawllp.com

28

## **VERIFICATION**

STATEE OF NEW YORK     )

                               ss.:

COUNTY OF NASSAU     )

       Brian Khunovich, being first duly sworn, deposes and says:

       I am the sole member of BKNS Management LLC ("BKNS"), the plaintiff bringing this derivative action to enforce a right that Abbson LLC may properly assert but has failed to enforce.  BKNS was a member of Abbson LLC at the time of the transactions complained of in the foregoing Amended Complaint, owning 39% of its membership interests.  I have read the foregoing Amended Complaint and know the contents thereof.  The same are true to my own knowledge, except for such statements made on information and belief, and as to those I believe them to be true.

                                     _____

                                         Brian Khunovich

Sworn to before me this
7th day of November, 2024.

_____
Notary Public

JOSEPH ZELMANOVITZ
Notary Public, State of New York
No. 02ZE4968456
Qualified in Kings County
Commission Expires June 25, 20__